**NATIONAL LABOR RELATIONS BOARD
v. DEL E. WEBB CONST. CO. et al.**

No. 14491.

United States Court of Appeals
Eighth Circuit.

May 8, 1952.

Fannie M. Boyls, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Mark C. Curran, all of Washington, D. C., on the brief), for petitioner.

Charles B. Blackmar, Kansas City, Mo. (Henry I. Eager, Robert W. Dammann, and Blackmar, Newkirk, Eager, Swanson & Midgley, all of Kansas City, Mo., on the brief), for respondent Del E. Webb Const. Co.

John J. Manning, Kansas City, Mo. (Clif. Langsdale, Kansas City, Mo., on the brief), for respondent International Union of Operating Engineers, Hoisting and Portable Local No. 101 of Greater Kansas City and Vicinity, A. F. of L.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

GARDNER, Chief Judge.

This is a petition of the National Labor Relations Board for the enforcement of a cease and desist order entered against respondents Del E. Webb Construction Company and International Union of Operating Engineers, Hoisting and Portable, Local No. 101 of Greater Kansas City and Vicinity, A. F. of L. We shall refer to the Respondents as the respondent company and the respondent union.

Pursuant to charges filed a joint complaint was issued by the National Labor Relations Board against respondents alleging violations of Sections 8(b)(1), 8(a) (3), 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(3), (b)(1)(A), (2). The complaint alleged that on or about December 21, 1949, respondent union caused respondent company to terminate the employment of one William H. Pickard because he was a member of Hoisting and Portable Local 101–B and not a member of respondent union, and that respondent company discharged said Pickard and has failed to reinstate him to his former position of employment because Pickard was not a member of respondent union. After hearing the trial examiner issued his intermediate report. Both respondents filed exceptions to the intermediate report and upon the entire record the Board entered findings. There is some dispute in the evidence but it appears either from the findings or the undisputed evidence that respondent company at the times here involved was engaged in the construction of a veteran's hospital at Kansas City, Missouri, and that its operations constituted interstate commerce. The members of respondent union operate various types of machinery used in the construction industry, including bulldozers and hi-loaders. In order to qualify for full membership in the respondent union an applicant must serve a five years' apprenticeship and must demonstrate proficiency in the operation of machines in four of the eleven classes recognized by the union. The international constitution of the Operating Engineers Union provides for the issuance of subcharters to local unions for apprentice units and respondent union in 1934 obtained one of such charters known as 101–B. This unit consists entirely of apprentices. The officers of respondent union serve also as officers of the subcharter unit. After serving the required time as apprentice members of the subcharter unit the apprentices may apply for membership in the parent union and such applications are passed on by the entire membership of the parent union.

For many years respondent union has had a seniority rule among its members by which members of the parent union are preferred to apprentices in the event of a general layoff and under this rule all apprentices must be laid off on a particular project before any member of the parent union is laid off, regardless of the status of

seniority on the project. Members of respondent union worked on the hospital project. There was no agreement, however, between the company and the union providing for the exclusive hiring of union members and apprentices as operating engineers.

During the months of November and December, 1949, William H. Pickard operated a hi-loader on the hospital project. He had been an apprentice of the union and a member of 101–B for several years. He was not eligible to membership in Local No. 101 because he had not served a five years' apprenticeship and because he was not skilled as an operator of sufficient types of machines. In December, 1941, respondent company discontinued night shift operation of air compressors and when this occurred the union steward informed Pickard that he had been "bumped" in accordance with the union's seniority rule because he was an apprentice and because a journeyman would otherwise have to be laid off. Pickard then asked the company superintendent to intervene with the union officials and also sought the intercession of George Shaw who was a former employer and the owner of the hi-loader which Pickard had been operating. There is no direct evidence that any representative of the union ever demanded of the respondent company that Pickard be discharged. He was discharged, however, and supplanted by a member of the respondent union.

The Board determined that the respondent company had discriminated against Pickard in violation of 8(a)(3) and 8(a)(1), expressing the view that any disparate treatment based on membership in the 101–B apprentice unit rather than membership in 101, the parent union, discouraged membership in the former and encouraged membership in the latter, and the Board determined that the respondent union attempted to cause and did cause respondent company to discriminate against its employees because of non-membership in respondent union, in violation of Sections 8(a)(3) and 8(b)(2).

Based on its findings the Board ordered the respondent company to cease and desist from encouraging membership in respondent union or in any other labor organization by discriminating against its employees and from in any like or related manner interfering with, restraining or coercing its employees in the exercise of their rights under the Act. The Board ordered respondent union to cease and desist from causing or attempting to cause respondent company to discriminate against its employees in violation of Section 8(a)(3) of the Act and in any like or related manner from restraining or coercing the employees in the exercise of their rights under the Act. Other facts will be developed in the course of this opinion.

In resisting the Board's petition for enforcement of its order, respondent contends: (1) that it was denied due process because it was not permitted to take certain depositions prior to the hearing; (2) that the finding of discrimination encouraging union membership is not supported by substantial evidence; while respondent union contends: (1) that its trade rule, absent any evidence of threat to enforce it, did not constitute an attempt to cause or to cause violation of Section 8(a)(3) of the Act; (2) that its trade rule that apprentices be laid off ahead of journeymen in the event of a general layoff, does not constitute discrimination within the meaning of Section 8(a)(3) of the Act.

The contention that respondent company was denied a fair hearing because it was not permitted to take the deposition of Pickard prior to the hearing is presented with great vigor and persuasive argument. The fact that in proceedings such as these one party not only complains and prosecutes but also decides makes it extremely important that a respondent be given every reasonable opportunity to prepare its defense, and the procedure in this regard should be such as to be free from suspicion of unfairness if public confidence and faith in the Board is to be maintained. In view of our conclusions as to the other issues involved, however, we find it unnecessary to review the questioned procedure in denying respondent company's motions to take depositions prior to trial.

Counsel for petitioner in their brief assert that, "If as the Board found,

the company terminated Pickard's employment because he was a member of Local 101–B and not a member of respondent Local 101 and this discrimination reasonably tended to encourage membership in respondent Local or to discourage membership in Local 101–B, it follows that the company has violated Section 8(a)(3) and (1) of the Act." Accepting this statement as a criterion by which the issue is to be determined, we think the vital question under the facts and circumstances here disclosed is whether the discharge of Pickard reasonably tended to encourage membership in respondent Local or to discourage membership in Local 101–B. The statute (Section 8(a)(3)) in substance provides that it shall be an unfair labor practice to encourage or discourage membership in any labor organization by discrimination in regard to hire or tenure of employment or any term or condition of employment. There was no agreement between the respondent union and the respondent company that only union members should be employed; neither was the respondent union the bargaining union for the employees of the respondent company. Pickard was a member of the subordinate union, Local 101–B. He became a member on his own volition and continued to be a member at all times here under consideration. Local 101–B, the apprentice order, was, we think, a sub-unit. It had no separate officers and we think can not be considered as a separate labor organization. The mere fact that when a member of the sub-unit or apprentice unit became eligible to promotion to the parent unit he had to pay a further fee is not, we think, significant. The same practice is in vogue in practically every fraternal order of the country which confers various degrees. But if we accept the Board's conclusion that Local 101–B was a separate independent union, the result would not be changed.

▬ The respondent union, prior to the time Pickard joined the apprentice unit, had a seniority rule. This rule gave preference or priority to the veteran operators but those who joined as apprentices accepted this rule and Pickard has never

indicated a desire to renounce his union status. It must be borne in mind that he was not eligible to membership in Local 101 and he actively sought such membership prior to the incident here involved. In these circumstances we are unable to see how the discrimination against him as here charged encouraged membership in the respondent union or discouraged membership in Local 101–B. Pickard could scarcely have been encouraged to become a journeyman member of respondent union because under no circumstances could he become such member. His status so far as union affiliations were concerned, was fixed and could not be changed at least by any act of the respondent company. It can scarcely be said that one may effectively be encouraged to do or not to do that which he is incapable of doing.

A somewhat similar situation was considered by the Court of Appeals for the Third Circuit in National Labor Relations Board v. Reliable Newspaper Delivery, Inc., 187 F.2d 547, 551. In that case an employer granted a retroactive wage increase to union employees but not to non-union employees doing the same type of work. The union involved was a closed union and hence the non-union employees were not eligible for union membership. The Board held that this action encouraged membership in the union. The court held, however, that the ineligible non-union employees could not be encouraged to join the union because it was not possible for them to do so. In the course of the opinion in that case the court, among other things, said:

"Even if the lack of intention to discriminate on the part of the employer is assumed to be of no account and if whether discrimination occurred be judged entirely from the facts, it still remains true, as conceded, that the non-union employees were unable to join the union. * * *

"* * * It was not the fault of the employer that they were unacceptable as union members. The union employees were so paid because that was the employer's contract obligation to them. * * *

"Even if we should assume that the disparity brought about by the retroactive payments amounted to discrimination, then, under the statutory language, we must go further and ascertain whether that discrimination encouraged membership in the Newspaper and Mail Deliverers' Union of New York and Vicinity. And we do not find substantial evidence of that encouragement. The non-union men knew that the employer was contractually bound to give the union members the retroactive increase if the new contract that increased wage rates was entered into. The non-union workmen also knew that in effect they were barred by the union from becoming members thereof and that the employer was powerless to assist them. The consequence of the delivery company living up to its obligation might cause its non-union employees to feel badly that the union would not permit them to join it and thereby enable them to share in the windfall. That result, however, cannot be here reasonably construed as evidence of an 8(a)(3) violation by the company because the assumed discrimination, under the peculiar uncontroverted facts, has not in this instance produced the statutory offense of encouraging membership in the deliverers' union. It would be necessary for us to completely close our eyes to the admitted facts in order to accept the Board's statement that the inevitable effect of the back wage payment was to encourage union membership because we know that membership in the union for non-union workmen was a practical impossibility."

So in the instant case, it being impossible for Pickard to become a member of the respondent union, nothing that respondent company might do by way of discriminating against him could be said proximately to encourage him to join a union which was impossible for him to join. There can be no violation of this statute unless the conduct complained of can have the proximate and predictable effect of encouraging or discouraging membership in a labor organization. N.L.R.B. v. Winona Textile Mills, 8 Cir., 160 F.2d 201; N.L.R.B. v. Potlatch Forests, 9 Cir., 189 F.2d 82; Western Cartridge Co. v. N. L.R.B., 7 Cir., 139 F.2d 855.

In this view of the law it is not, we think, as we have already observed, material whether Local 101 and Local 101–B are the same or different unions. Members of respondent union are skilled craftsmen. There is provision for an orderly promotion from the apprenticeship stage to the journeyman status, after which a member may properly be regarded as a master craftsman. Nothing in the National Labor Relations Act prevented a union from adopting rules of its own as to distribution of work among its members. No one is required to join the union and subject himself to such rules and regulations; neither is there any inhibition against his withdrawing from the union if such rules and regulations are not satisfactory to him.

We conclude that the termination of Pickard's employment did not reasonably tend to encourage membership in respondent union or to discourage membership in Local 101–B within the purview of the National Labor Relations Act. The petition to enforce the cease and desist order of the National Labor Relations Board is therefore denied.