**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LITTLE ROCK, LOCAL 382–382A, AFL–CIO, Respondent.**

No. 16373.

United States Court of Appeals
Eighth Circuit.

June 29, 1960.

952

Herman M. Levy, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Tom Gentry, Little Rock, Ark., for respondent.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

MATTHES, Circuit Judge.

Pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160 (e), the National Labor Relations Board has petitioned this Court to enforce its order of June 26, 1959, which requires Respondent, referred to herein as "Union", to cease and desist from certain unfair labor practices. The Board found that as the result of an unlawful arrangement or understanding between employer Armco Drainage and Metal Products, Inc., hereinafter called "Armco," and Union, the latter had caused Armco to discriminatorily discharge its employee George W. Copeland, in violation of § 8 (b) (1) (A) and 8(b) (2) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C.A. § 158(b) (1) (A) and § 158(b) (2). The Board further found that the arrangement and understanding constituted an exclusive hiring hall arrangement, illegal per se, in violation of § 8(b) (2) and (1) (A) of the Act, 29 U.S.C.A. § 158(b) (2) and (1) (A).[1] In addition to requiring Union to

---

1. The Board supports its finding of illegality per se with its decisions and orders in Mountain Pacific Chapter of the Associated General Contractors, Inc., 119 N.L.R.B. 883, and Fluor Co., Ltd., 122 N.L.R.B. 1374. Subsequent to the findings here, the Board's decision in Mountain Pacific was reversed upon this ground and remanded for further consideration, N.L.R.B. v. Mountain Pacific

cease and desist from the unfair labor practices, the order affirmatively requires that Union make Copeland whole; that it refund to all present and former employees of Armco all sums, including initiation fees and dues, exacted from them as a result of the unlawful hiring arrangement, and that it post appropriate notices. The Board's Decision and Order are reported at 123 N.L.R.B. No. 212.

We now turn to the circumstances giving rise to the order before us. The real dispute between the parties centers upon the inference to be drawn from the facts, not upon the facts themselves. In February, 1958, Armco was engaged in installing certain metal products at a project in Foreman, Arkansas. Copeland had been employed by Armco as a truck driver since July, 1957, and he was a member of the International Union of Operating Engineers, Local 450 of Houston, Texas. Pursuant to instructions from Armco, Copeland drove a company truck from Houston, Texas, to the job site at Foreman, and reported for work on February 17, 1958. Armco's foreman, Robert A. Wilson, referred Copeland to Union's job steward, Howell, for clearance. Howell informed Copeland he was unable to contact the union official who had authority to issue clearance by telephone. Howell then suggested that a member of Local 382 be placed in the truck with Copeland so that "the truck could go ahead and operate" and "to keep from having to stop the job until he could find out something further." This procedure was followed on Monday. On the following morning, Wilson informed the standby that his company would not pay for two men to operate the same truck, and the standby then left the truck. Later, Armco offered to pay the standby for the time he spent in the truck with Copeland.

Copeland worked on Tuesday, apparently without incident. The following morning (Wednesday) at about 8:00 o'clock, Howell, Union's steward, introduced a man named Taylor to Wilson, Armco's foreman. Taylor, a member of Union[2], had a work card signed by J. W. Smith, Union's assistant business agent, who was authorized to issue clearances for the Foreman, Arkansas project. Wilson took Taylor to the truck which Copeland was operating, introduced him to Copeland, exhibited Taylor's work card and informed Copeland that Taylor was there to operate the truck. Copeland explained the operation of the truck to Taylor, then left the truck and waited at the job site for Smith to appear. Later, upon Smith's appearance, Mr. Lamb, Armco's superintendent, requested Smith to clear Copeland, stating that Armco preferred to have one of its regular employees operate the truck. Smith replied that he could not give clearance to Copeland as long as there were members of Union without employment. When Smith was asked what would happen if Copeland worked without a permit, he stated "that would be left up to the job steward and the other operating engineers on the job." When Smith stated he would allow Copeland to replace Taylor if the other engineers and the job steward would "go along with it," Howell, the job steward, said "No." Wilson testified as to efforts to persuade Smith to clear Copeland:

"Q. Please state what you recall. A. Mr. Smith came on the job and Mr. Howell introduced him and I asked him to clear Copeland in so he could operate the truck and he said he definitely could not do it and went on to different conversations and why he couldn't do it.

"Q. Did he state why he couldn't do it? A. They (sic) said they

Chapter of Associated General Contractors, 9 Cir., 270 F.2d 425, while the Board's order in the Fluor Co., Ltd. case was set aside in its entirety. International Union of Operating Engineers, Local 150 v. N.L.R.B., D.C.Cir., 273 F.2d 833.

2. Although there is no direct testimony in the record of Taylor's actual membership, such conclusion is implicit in all the evidence.

would hang him to the highest tree out there if he had some men loafing in that local and that was the reason he wouldn't clear George into (sic) operate the truck and wanted one of his men on the local on it."

After this conversation, Copeland stated that he would leave the job site so as not to cause any labor strike and confusion.[3]

As opposed to the above evidence, establishing the actual statements and actions of the parties at the job site, agents of Armco and Union testified that there was no agreement between the parties concerning hiring practices at the project.

Upon consideration of the foregoing evidence, the Board found (a) that Copeland did not voluntarily quit, as contended by Union; and (b) that he was discharged, discriminatorily, following an effective request by Union, pursuant to an unlawful hiring arrangement and understanding between Armco and Union.[4]

■■ The function of this Court is limited to a determination of whether there is substantial evidence, upon the record considered as a whole, to support the findings of the Board. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Furthermore, the Board is entitled to draw all reasonable inferences from the established facts. This power was specifically recognized in Radio Officers', etc. v. National Labor Relations Board, 347 U.S. 17, at pages 48, 49, 50, 74 S.Ct. 323, at pages 339, 340, 98 L.Ed. 455:

"An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. * * * We therefore conclude that insofar as the power to draw reasonable inferences is concerned, Taft-Hartley did not alter prior law."

See also, N. L. R. B. v. Transamerican Freight Lines, 7 Cir., 275 F.2d 311, 314.

The precise contention of Union is that, on the record as a whole, there is no substantial evidence of any bilateral understanding or agreement that only members of Union would be employed on the Foreman, Arkansas project, nor is there evidence which establishes that, pursuant to such agreement, Copeland was discriminatorily discharged because he was not a member of Union. More precisely, Union's position is that Armco, unilaterally, sought out the union, as a matter of company policy, and that any unlawful act of discrimination in regard to hiring practices at the Foreman project was the act of Armco alone.

■ It is true that, absent proof of an unlawful agreement, neither the employer nor union can be held accountable for the unilateral actions of the other. See Del E. Webb Const. Co. v. National Labor Relations Bd., 8 Cir., 196 F.2d 841, 38 A.L.R.2d 402; National Labor Relations Board v. Brotherhood of Painters, etc., 10 Cir., 242 F.2d 477, at pages 479, 480. Furthermore, as stated in Del E. Webb Const. Co., supra, 196 F.2d at page 845, relied upon by Union, "[t]he factor in a hiring-hall arrangement which makes the device an unfair labor practice is the agreement to hire *only* union members referred to the employer".[5]

3. Subsequently, upon charges filed by Copeland, the General Counsel of the Board issued a complaint against Union. No charges were filed against Armco.

4. The trial examiner, in recommending that the complaint be dismissed, found, in effect, that Union was not a party to "tacit arrangements and understandings bilateral in nature," further finding that employee Copeland was not discharged but voluntarily quit, and that Union did not cause Armco to discharge him.

5. See Morrison-Knudsen Company v. N.L. R.B., 9 Cir., 276 F.2d 63, 67–68. Because of the itinerant nature of construction work, employers frequently must call upon union hiring halls in order to secure competent workers within the area of construction. Congress has recognized the special nature of the building and

(Emphasis supplied.) While there may be some question concerning the circumstances under which a hiring hall arrangement may be ruled illegal per se, absent proof of actual discrimination,[6] the law is firmly established that a showing of actual preferential discrimination in the maintenance of a hiring hall arrangement renders such arrangement unlawful, and if a union, pursuant to such an agreement, causes, or attempts to cause, an employer to discriminate in its hiring practices, the union violates the Act. See National Labor Relations Board v. Local 57, etc., 1 Cir., 201 F.2d 771; National Labor Relations Board v. Swinerton, 9 Cir., 202 F.2d 511, certiorari denied 346 U.S. 814, 74 S.Ct. 24, 98 L.Ed. 341; N. L. R. B. v. Local 176, United Broth. of Carpenters, etc., 1 Cir., 276 F.2d 583; Morrison-Knudsen Company v. N. L. R. B., 2 Cir., 275 F.2d 914, 916; N. L. R. B. v. Millwrights' Local 2232, District Council of Houston, 5 Cir., 1960, 277 F.2d 217; National Labor Relations Board v. Local 743, etc., 9 Cir., 202 F.2d 516; National Labor Relations Board v. Local 369, etc., 3 Cir., 240 F.2d 539.

■ From the conceded facts, we are satisfied that there was ample evidence to support the Board's finding that there was an implied or tacit unlawful hiring hall understanding or arrangement between Armco and Union which led to Copeland's discharge. Throughout the record, the evidence indicates that Union actively and vigorously asserted its control over Armco's hiring practices insofar as they involved operation of the machine assigned to Copeland. Such circumstances as the conduct of Armco in sending Copeland to Union for clearance in the first instance—the insistence of Union, with acquiescence by Armco, that one of its members ride as a "standby" in the truck so that Union's job steward would be in the clear—the discussions between Armco and business agent Smith, in which clearance was sought and denied—the act of Union in sending one of its members to the job site with a work permit, advising that he "was there to operate the truck"—the fact that Armco ultimately capitulated and accepted Taylor, a Union member, in preference to its own employee, Copeland, who had been specially summoned from Texas for this particular job—all of these circumstances belie the bald assertion that there was no such agreement, and, to the contrary, impel the conclusion that Union and Armco had in some way agreed that non-members of Union could not perform this work unless cleared by Union. The combination of circumstances here is scarcely explainable except on such a hypothesis, and makes no other explanation reasonable. See National Labor Relations Board v. Local 369, etc., 3 Cir., 240 F.2d 539, and National Labor Relations Board v. International Union, etc., 8 Cir., 216 F.2d 161, 164, where this Court, in enforcing an order, held that the question of whether a discriminatory discharge was effected, being one of fact, could be proved by circumstantial evidence. Certainly, the facts established here prove fatal to Union's contention that it merely undertook to supply competent operators pursuant to the unsolicited and unilateral request and preference of Armco.

The Webb decision, upon which Union strongly relies, turned upon the failure to show that an *unlawful* agreement had been entered into, inasmuch as there was no indication that employment was made conditional upon union membership. There, this Court observed that the Board's conclusion was based upon "inferences and suspicions drawn from remote circumstances," and this distinguishing factor is further pointed up by the observation, 196 F.2d 841, at page

construction industry in a recent amendment to § 158. See § 158(f), 29 U.S. C.A., added by Pub.L. 86–257, § 705(a), September 14, 1959.

6. See N.L.R.B. v. Mountain Pacific Chapter, etc., 9 Cir., 270 F.2d 425; Morrison-Knudsen Company v. N.L.R.B., 9 Cir., 276 F.2d 63; Morrison-Knudsen Company v. N.L.R.B., 2 Cir., 275 F.2d 914, 917; Local 357, International Brotherhood of Teamsters, etc. v. N.L.R.B., D.C. Cir., 275 F.2d 646.

846: "If a non-union man had applied and been refused, an entirely different situation would be presented."

Union's contention that there is no substantial evidence to support the finding that Copeland was actually discharged from employment has no merit. It is true that Armco did not discharge him in specific language, but under the circumstances heretofore discussed, the Board was entitled to find that for all practical purposes, he was discharged, and his departure from the project was in no way voluntary. Certainly Copeland was not required to resort to a more active defense of his rights which could well have provoked more unseemly behavior. Compare National Labor Relations Board v. Local 57, etc., 1 Cir., 201 F.2d 711.

### Brown-Olds Remedy.

As to this facet of the case, the Board concluded that:

"By its unlawful exclusive hiring arrangement with Armco, the Respondent unlawfully has caused Armco to encourage union membership to obtain or retain employment, thereby inevitably coercing employees hired pursuant to such agreement to pay union initiation fees and dues, and other monies unlawfully exacted from them. As part of the remedy, therefore, we shall order the Respondent to refund to Armco's employees at the Foreman, Arkansas, project, all sums, including initiation fees and dues, exacted from them as a result of the Respondent's unlawful hiring arrangement with Armco." (The extent of Union's liability for reimbursement was fixed beginning 6 months prior to filing of the charge, extending to all such monies collected thereafter).

Two members of the Board agreed that Union violated § 8(b) (1) (A) and (2) by effectively requesting and thereby causing Copeland's discriminatory discharge by Armco. However, in view of the fact that Union's jurisdictional interest was limited to the single job assigned to Copeland and in view of the isolated character of the incident, they were of the opinion that the evidence was insufficient to establish the existence of any continuing practice or contractual arrangement between the parties. They therefore refused to join "in that part of the majority's opinion ordering the Respondent to refund to employees the dues and other monies exacted pursuant to the Respondent's alleged arrangement and understanding with Armco."

The "Brown-Olds Remedy," which had its inception in United Association of Journeymen & Apprentices, 115 N.L.R.B. 594, has been applied and enforced when the facts formed a basis for a reasonable inference of the coercive character of initiation fees and dues collected by a union, i. e., that the receipt of funds by the Union was occasioned by the particular unlawful labor practice in question. Thus, in the original "Brown-Olds" decision it was shown that the "closed shop" contract, found to be unlawful in itself, had further adopted by reference certain sections of the union constitution and by-laws which exacted a 2% working assessment in addition to $3 monthly dues which admittedly had been collected.[7]

Such remedy, requiring a return of "the very fruits of the unfair labor practice itself," thereby expunging the illegal effect of the unfair labor practice, United Association of Journeymen & Apprentices, supra, at p. 601, may be used under proper circumstances as a means of effectuating the policies of the Act. See Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, at page 541, 63 S.Ct. 1214, at page 1219, 87 L.Ed. 1568. Upon analysis of the numerous cases which have ruled upon the applicability of the "Brown-Olds" remedy, we have reached the conclusion that they turn upon a significant factor. Primarily, a determination of the coer-

7. The Board observed that such requirement of itself was illegal as conditioning employment upon a requirement in addition to the "periodic dues and the initiation fees uniformly required." See §.8(b) (2) of the Act.

cive nature of the payments to the union must be reached upon facts which lend support to a reasonable inference of such coercion. This requires a showing that the receipt of funds was directly related to the unlawful practice. See National Labor Relations Board v. Local 404, etc., 1 Cir., 205 F.2d 99; and compare, N. L. R. B. v. Local 60, United Broth. of Carpenters, etc., 7 Cir., 273 F.2d 699; Morrison-Knudsen Company v. N. L. R. B., 9 Cir., 276 F.2d 63, 73-74. In cases which refused enforcement of the broad remedy, the courts found that there was no direct relation between the illegal act and the collection of fees, or that the evidence in some other way demonstrated lack of coercion, or failed to furnish a basis for a reasonable inference of such coercion. See N. L. R. B. v. Millwrights' Local 2232, District Council of Houston, 5 Cir., 1960, 277 F.2d 217; Lakeland Bus Lines, Inc. v. N. L. R. B., 3 Cir., 1960, 278 F.2d 888; Building Material Teamsters, Local 282, etc. v. N. L. R. B., 2 Cir., 275 F.2d 909, at pages 912-913; Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., D.C.Cir., 275 F.2d 646. Frequently, the courts, in refusing to enforce an order for refund of fees and dues, have spoken in terms of a proper interpretation of the powers of the Board in effectuating the policies of the Act. This approach often appears when the remedy is sought against the employer only. See Morrison-Knudsen Company v. N. L. R. B., 2 Cir., 275 F.2d 914, 918; N. L. R. B. v. American Dredging Company, 3 Cir., 276 F.2d 286; Morrison-Knudsen Company v. N. L. R. B., 9 Cir., 276 F.2d 63, 74, and compare, N. L. R. B. v. Local 176, United Broth. of Carpenters, etc., 1 Cir., 276 F.2d 583.

For an exhaustive discussion and summary of decisions concerning application of this remedy, see the recent case, National Labor Relations Board v. United States Steel Corp., etc., 3 Cir., 1960, 278 F.2d 896.

In reverting to the instant facts, and from our consideration of the entire record, we must rule that there is no evidentiary basis for a finding that monies were coercively collected by Union as a result of the unlawful hiring arrangement in existence between Armco and Union on February 19, 1958, nor do the facts afford a basis for such an inference. Obviously, an order to refund fees and dues would have no effect as to Copeland's employment and wrongful discharge, for he paid nothing to Union, coercively, or otherwise. Compare, Morrison-Knudsen Company v. N. L. R. B., 9 Cir., 276 F.2d 63. From the record, we learn that Armco was one of several subcontractors on the project; that it began the Foreman job about February 17, 1958, and completed its contract in approximately 3 months; that it employed no more than 10 men at any one time and that only one operating engineer was on the project at any given time. Apparently, Union's jurisdictional interest in the Armco contract was limited to the single job assigned to Copeland. Although the man assigned to sit in the truck with Copeland was described as a "Local 382 man," it appears that he was an employee of another firm working on the project. Although Taylor, who took Copeland's job, was a member of the Union, there is not one word in the record as to when he joined, the circumstances attending his affiliation with Union, or any other facts concerning his membership. Under these circumstances, and upon this record, there is no evidence from which it could reasonably be inferred that any person was coerced in regard to Union membership by reason of the unlawful arrangement which led to Copeland's discharge. See and compare, Morrison-Knudsen Company v. N. L. R. B., 9 Cir., 276 F.2d 63.

The Board's order is modified in accordance with the foregoing views, and, as so modified, the order will be enforced.