NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BREWERY AND BEER DISTRIBUTOR DRIVERS, HELPERS AND PLAT-FORM MEN, LOCAL 830, INTERNA-TIONAL BROTHERHOOD OF TEAM-STERS, CHAUFFEURS, WAREHOUSE-MEN AND HELPERS OF AMERICA, Independent, Respondent.

No. 13163.

United States Court of Appeals Third Circuit.

Argued July 11, 1960.

Decided July 28, 1960.

Rehearing Denied Aug. 25, 1960.

Robert Sewell, Washington, D. C., (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa. (Wilderman & Markowitz, Philadelphia, Pa., on the brief), for respondent.

Before GOODRICH, KALODNER and FORMAN, Circuit Judges.

GOODRICH, Circuit Judge.

■ The Delaware Valley Beer Distributors Association, consisting of a number of small beer distributors in the Philadelphia area, complained to the National Labor Relations Board that the respondent union had violated Section 8 (b) (4) (A) of the Labor Management Relations Act[1] by inducing and encouraging employees of neutral breweries and importing distributors not to load beer orders given by members of the complaining association unless and until the members signed an agreement made between the union and another distributors association called "Philadelphia Beer Distributors Association."[2] This conduct, if proved, is violative of the statute as interpreted by the Supreme Court in Local 1976, Carpenters v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed. 2d 1186. Mr. Justice Frankfurter said, for the Court, in that case that Congress "aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods." 357

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*." 29 U.S.C.A. § 158(b) (4) (A).

2. The alleged objective of respondent's actions was to force the neutral employers to cease doing business with the members of the complaining association.

U.S. at page 100, 78 S.Ct. at page 1016.[3]

■ It is unnecessary to review in detail the proof which the Board had before it as to each individual instance where the prohibited conduct took place. The testimony showed that with five breweries or beer importing concerns five of these small distributors belonging to the complaining association were refused beer purchases after statements by "stewards" of the union to employees of the neutral employers to the effect that the would-be purchaser could not get his merchandise until he "signed up."[4] Respondent's counsel points out that only eight[5] instances of presumably thousands of sales have been cited. We think the instances proven are sufficient to show a pattern and that the Board was right in concluding that these would-be purchasers did not get their beer because of the inducements of the employees of the neutral breweries and importers by the "stewards" and that the action of the "stewards" was done with an objective[6] of forcing the neutrals to cease doing business with the complainants.

The respondent union, however, makes one argument which must be taken with great seriousness. It says that there is nothing in this record which shows that the people who gave these orders not to supply beer to members of the complaining association were agents of the union. With regard to two of the instances, that is, the refusal of the Scott & Grauer employees to supply Sinclair Washington and Martin Miller, the point is well taken. There is no evidence whatsoever of action by any agent of the union. The whole case here rests on supposition. Miller thought the man who spoke on behalf of the union was a steward;[7] Washington's testimony adds nothing on this point. It is categorically denied that the man was a steward or that Scott & Grauer even had a steward or acting steward at that time.[8] We think the evidence far too weak to support any order so far as the Scott & Grauer incidents are concerned.

■ As to the other incidents, the testimony shows that the persons giving the orders to the employees of the neutral employers were "stewards." There is not, so far as the case has been present-

---

3. Justice Frankfurter was careful to note that "a union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees." 357 U.S. at page 99, 78 S.Ct. at page 1016.

4. We think that the Board's conclusion that the remarks made constituted inducements to the employees of the neutral employers was well founded.

5. In light of our subsequent disposition of the incidents involving Scott & Grauer, we, in reality, have here only six instances of unlawful conduct involving four secondary employers and four primary employers.

6. It need not have been the sole objective. See N. L. R. B. v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; International Broth. of Elec. Workers v. N. L. R. B., 1951, 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299.

7. "Trial Examiner: How did you get the opinion he was the steward of Local 830 at that place?

■

"The Witness [Miller]: Marvin [the Scott & Grauer order-taker] had said to me that he is going out to ask the steward if it was all right to load my truck, and since he went to Shroeder, I thought he was the steward."

8. The President of Local 830 testified as follows:

"Who was the steward during the month of March, 1958, at Scott and Grauer? A. I don't think we had one.

"Q. Did you have an acting steward or someone acting instead of the steward? A. Not to my knowledge.

"Q. Do you know Axel Shroeder? A. I know of him.

"Q. Does he perform union duties in the nature of the stewardship?

* * * * *

"A. He was never appointed by the union, to my knowledge.

"Q. Never appointed. Well, despite the lack of appointment, did he ever perform union duties as a steward? A. That I wouldn't know."

ed to us, anything to show what scope of authority these stewards have in representing their union. The record contains no constitution or by-laws of the union to help us in this respect. We do think, however, that there is something shown by the fact that different people holding the office of steward at different places of business gave the same kind of orders and indulged in the same kind of conduct. This is good evidence to show how stewards were acting and, in view of the fact that several of them were acting in this way, is good circumstantial evidence to show that this action was within their general scope of authority. There is also the point that an expert body like the Board knows what some labor terms mean without having their meanings spelled out in each individual case. When the shoe is on the other foot and employers are being charged with unfair labor practices numerous cases have held employers responsible for antiunion acts of their foremen.[9] We think it is fair enough to make unions responsible for the unfair labor practices indulged in by their stewards whose positions in the union are certainly comparable to that of the foremen on a factory floor. This point, therefore, we think not well taken except as already said as to the Scott & Grauer incidents.[10]

There is talk in the respondent's brief and argument about the legality of certain picketing. We see no need to go

into this. The trial examiner mentioned it. The Board did not prohibit it by its order nor did it pass upon the matter. Neither shall we.

### Remedy

■ Respondent attacks the Board's order on two grounds. The first is that it is too vague. We take it that the union would insist that the order prohibit only the precise conduct which the evidence shows was indulged in by the stewards at the various beer distribution centers. We think this objection is not well taken. If the respondent is prohibited from only one type of conduct coming under the prohibitions of the act it is free to indulge in others. If it is true that the order seems to read in the phraseology of the act, respondent cannot complain because this is the language Congress chose to use in describing the type of things which people are forbidden to do.[11]

The second objection made by the union to the scope of the order has more to it. The respondent is forbidden from engaging in certain conduct directed to the employees of the five distributors at whose places of business the acts complained of occurred. To that the Board adds "or any other employer" and further on repeats the term "any other employer" when referring to the primary employers against whom the acts are directed. It also prohibits certain acts where an object is to force or require the employers mentioned "or other persons" to cease doing business with the primary employers.

9. See e. g., H. J. Heinz Co. v. N. L. R. B., 1941, 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Jas. H. Matthews & Co., 3 Cir., 1946, 156 F.2d 706, 708; Time-O-Matic, Inc. v. N. L. R. B., 7 Cir., 1959, 264 F.2d 96, 98–100.

10. This is not a case like N. L. R. B. v. P. R. Mallory & Co., 7 Cir., 1956, 237 F.2d 437, where the stewards were acting contrary to union policy or express directions from the union. As in N. L. R. B. v. Local 135, International Brotherhood of Teamsters, 7 Cir., 267 F.2d 870, certiorari denied 1959, 361 U.S. 914, 80 S.Ct. 258, 4 L.Ed.2d 184, the record tends to show an established union policy, in this case a policy of preventing

the recalcitrant beer distributors from getting any beer until they sign up with the union.

11. In International Broth. of Elec. Workers v. N. L. R. B., 1951, 341 U.S. 694, 706, 71 S.Ct. 954, 961, the Supreme Court thought it appropriate to apply to the Board's order the following principle announced in International Salt Co. v. United States, 1947, 332 U.S. 392, 400, 68 S.Ct. 12, 92 L.Ed. 20: "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." We think that principle equally applicable here.

The scope of NLRB orders has recently been before this Court in several cases.[12] We do not need to repeat here the discussion of the problem found in the opinions just cited.

█ The attack here upon the inclusion of persons other than the particular primary and secondary employers named in the order is not well taken. From the very pattern shown in the testimony before the Board the danger of the occurrence of the prohibited conduct is much wider than inducements confined to employees of the specifically mentioned secondary employers. In the same respect, the danger goes beyond action directed against the specifically named primary employers. Therefore, the widening of the prohibition beyond those named is not objectionable.[13]

█ We do think it objectionable, however, that there is no limitation put on the scope of the Board's language. "Any other employer" can mean, we take it, any other employer in the United States or any other place where the Board's writ may run. We do not think this was intended but it certainly is included. The controversy here arose between a local union and local distributors. We think the order should be limited so as to make it applicable to the situation (both places and persons) which gave rise to this litigation.

In view of what is said above concerning the lack of proof with regard to the incidents at Scott & Grauer, that portion of the order which deals with forcing Sinclair Washington or any other employer to join the union is necessarily to be omitted.[14]

With these modifications the Board's order will be enforced.

---

12. For cases dealing with the general power of the Board to frame remedies, see N. L. R. B. v. American Dredging Co., 3 Cir., 1960, 276 F.2d 286; N. L. R. B. v. United States Steel Corp. (American Bridge Division), 3 Cir., 1960, 278 F.2d 896; Lakeland Bus Lines, Inc. v. N. L. R. B., 3 Cir., 1960, 278 F.2d 888; N. L. R. B. v. Local 1566, ILA, 3 Cir., 1960, 278 F.2d 883; Paul M. O'Neill Int'l Detective Agency, Inc. v. N. L. R. B., 3 Cir., 1960, 280 F.2d 936.

For cases in this Court subsequent to the Supreme Court's decision in Communications Workers v. N. L. R. B., 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896, dealing with the Board's use of such all-encompassing terms as "any other employer," see NLRB v. United States Steel Corp. (American Bridge Division), 278

F.2d 896, (Supplemental Opinion, May 17, 1960); Lakeland Bus Lines, Inc. v. N. L. R. B., 278 F.2d 883 (Supplemental Opinion, June 3, 1960).

13. See N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 436–437, 61 S. Ct. 693, 85 L.Ed. 930. Compare Communications Workers v. N. L. R. B., 1960, 362 U.S. 479, 80 S.Ct. 838, with International Broth. of Elec. Workers v. N. L. R. B., 1951, 341 U.S. 694, 705–706, 71 S.Ct. 954.

14. Since the Board seems to be following the policy of naming specific persons or companies in its order only when there has been found to be a specific 8(b) (4) (A) violation concerning them, the names "Scott and Grauer" and "Sinclair's Beer Distributor" should also be omitted.